IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2020 MAY -1  P 1:03

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| **ALABAMA MUNICIPAL INSURANCE CORPORATION, a non-profit corporation,** ) ) ) | |
| Plaintiff, ) ) | CASE NO.: 2:20-cv-300-MHT-WC |
| v. ) ) | |
| **MUNICH REINSURANCE AMERICA, INC.,** a foreign corporation, ) ) ) | |
| Defendant. ) | |

## COMPLAINT

This is a case about the plaintiff, an Alabama non-profit insurance company, sending multiple valid claims to its now former insurer and that insurer failing to honor fully those claims thereby causing nearly $1,900,000 in out-of-pocket damages to the plaintiff. These actions by the defendant were in breach of the insurance contracts. Additionally, the defendant's actions were a bad faith refusal to pay fully the plaintiff for which punitive damages are due to be awarded against the defendant.

### I.   PARTIES

1.   Plaintiff Alabama Municipal Insurance Corporation ("AMIC"), is and was at all times material herein an Alabama non-profit public entity, whose principal place of business is in Montgomery, Alabama. AMIC is a non-profit insurance company owned and overseen by cities in Alabama and funded by taxpayer dollars.

2.   Defendant Munich Reinsurance America, Inc., ("MRAm") is a foreign corporation with its principle place of business in Princeton, New Jersey and is doing business in this District.

8817001.2

## II. JURISDICTION

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## III. SUMMARY OF FACTUAL ALLEGATIONS

4. AMIC is a non-profit insurance company that provides insurance for the benefit of Alabama cities.

5. AMIC was founded in 1989 by the Alabama League of Municipalities ("League") in response to the challenges Alabama cities faced obtaining affordable liability insurance coverage.

6. In 1989 when AMIC was formed, Alabama did not have either captive insurance or pooling statutes, but operates on a pooling model.

7. AMIC is organized as a regulated insurance company.

8. AMIC falls under the regulatory authority of the Alabama Department of Insurance ("ALDOI").

9. AMIC is wholly owned by its members, all of which are Alabama municipalities.

10. AMIC is only chartered to insure Alabama's cities, towns, and their subsidiary incorporated entities.

11. Currently, AMIC provides access to insurance coverage to its members that might not otherwise have access to affordable liability insurance.

12. AMIC provides insurance to most of the municipalities in Alabama, especially small towns. Even for larger Alabama municipalities, AMIC insures subsidiaries to those cities, like bus services.

13. Although AMIC has the benefit of insurance policy endorsements that track the language of municipal caps, AMIC occasionally finds itself providing a defense and indemnity in cases where the plaintiff claims the potential exposure to AMIC exceeds those caps.

14. AMIC in turn requires the services and protections of insurance offered by companies like MRAm to manage AMIC's own risk.

8817001.2

15. AMIC relies on insurers like MRAm to treat and evaluate AMIC claims in a fair and prompt manner, exercising good faith and a loyalty to AMIC as an insured.

16. For each of the claim listed below, AMIC and MRAm entered into an insurance contract entitled "Casualty Excess of Loss Reinsurance Agreement" bearing the identifying numbers: 1236-0018; 1236-0021; 173135-3012236; 173135-3012236-2009; 173135-3012236-2011. ("The Treaties.")

17. On information and belief, when MRAm entered into these Treaties with AMIC, MRAm was aware that:

  a.) AMIC was an Alabama entity,

  b.) AMIC only insured in Alabama municipalities and incorporated subsidiaries of Alabama municipalities,

  c.) AMIC fell under the regulatory authority of ALDOI, and

  d.) AMIC insurance claims to MRAm would arise out of or relate to Alabama municipalities and their subsidiary corporate entities.

18. For years prior to the claims set forth below, AMIC made insurance demands to MRAm involving disputes by or against Alabama municipalities.

19. Notwithstanding these prior claims, MRAm entered into the Treaties referenced in this complaint, knowing that AMIC's insurance claims to MRAm would involve Alabama municipalities or their subsidiary corporate entities.

20. In each of the Treaties, AMIC agreed that it "shall retain and be liable for the first $350,000 of Ultimate Net Loss, per occurrence, per line of business, per member."

21. AMIC also agreed to and paid the premium for the Treaties.

22. At no time prior to the filing of this action did MRAm notify AMIC that AMIC was delinquent in the payment of premiums.

23. In the Treaties, Munich Re agreed that it "shall then be liable for the amount by which such Ultimate Net Loss exceeds the retention of the Company [AMIC]."

8817001.2

24. The Treaties defined "occurrence" to mean "any one accident, disaster, casualty or happening, or series of accidents, disasters, casualties or happenings arising out of or caused by one event or one causative agency, regardless of the number of interests insured, number of Coverage Forms involved, or number or kinds of perils involved. Furthermore, all losses having a common origin or traceable to the same act, omission, mistake, happening or causative incident shall be considered one accident, disaster, casualty or happening."

25. For the time periods relevant to this case, AMIC had a three hundred and fifty thousand dollar ($350,000) per occurrence self-insured retention deductible per policy period.

26. In every meaningful respect, the relationship between AMIC and MRAm was a insured/insurer relationship. Indeed the policies (sometimes called "treaties") between AMIC and MRAm referred to AMIC as an "insured."

27. AMIC dutifully reported each of the claims associated with this legal action and provided MRAm with reporting about the progress of the underlying claim for which AMIC was providing a defense to its insureds.

28. Under the MRAm/AMIC policies, if MRAm was dissatisfied with AMIC's handling of the case, the policies relevant to this dispute allowed MRAm to assume control of the underlying litigation.

29. From December 31, 2010, up to the December 31, 2015, MRAm denial of full payment in the Town of Woodland matter set forth below, MRAm had never declined to pay more than $10,000 on an insurance claim made to MRAm by AMIC.

30. In or around September and October of 2015, AMIC and MRAm had discussions about the rates for a policy renewal.

31. Around the same timeframe, AMIC had received a competitive rate quote from another reinsurer, Old Republic.

32. As a non-profit funded with taxpayer dollars, AMIC has a responsibility to seek fair and competitive rates for its insurance.

- 4 -

8817001.2

33. In 2015, AMIC asked MRAm to meet the competitive premium being offered by another re-insurer or at least to keep the current MRAm premiums in place.

34. In 2015, MRAm declined to meet (meaning match) the Old Republic premium.

35. MRAm also declined to keep its premium for the AMIC renewal policy at the same premium MRAm had been paid by AMIC for the 2015 policy period.

36. Instead MRAm only offered AMIC a 2016 renewal policy at an increased premium.

37. AMIC declined to accept the increased MRAm premium.

38. Subsequently, MRAm repeatedly declined to pay 100% of the AMIC insurance claims that AMIC presented to MRAm.

39. Specifically, from 2015 to 2018 AMIC submitted insurance claims **involving Town of Woodland, AL; Spanish Fort, AL; Fairhope, AL; Hanceville, AL, Water Works Board and Childersburg, AL** ("Subject Claims").

40. On each of the Subject Claims, MRAm paid less than the amount of approximately one million nine hundred thousand dollars ($1,900,000) (not inclusive of interest).

41. AMIC believes that each of these claims should have been fully reimbursed and that MRAm's decision to do otherwise was in bad faith.

42. The parties entered into an insurance contract entitled "Casualty Excess of Loss Reinsurance Agreement No. 173135-3012236-2009." ("The Treaty.")

43. In the Treaty, AMIC agreed that it "shall retain and be liable for the first $350,000 of Ultimate Net Loss, per occurrence, per line of business, per member."

44. AMIC also agreed to and paid the premium for the Treaty.

45. In the Treaty, Munich Re agreed that it "shall then be liable for the amount by which such Ultimate Net Loss exceeds the retention of the Company [AMIC]."

46. The Treaty defined "occurrence" to mean "any one accident, disaster, casualty or happening, or series of accidents, disasters, casualties or happenings arising out of or caused by one event or one causative agency, regardless of the number of interests insured, number of

- 5 -

Coverage Forms involved, or number or kinds of perils involved. Furthermore, all losses having a common origin or traceable to the same act, omission, mistake, happening or causative incident shall be considered one accident, disaster, casualty or happening."

47. As an insurer of AMIC, MRAm had an enhanced duty of good faith.

48. As part of that enhanced duty of good faith, MRAm was under an obligation not to take any action that showed it had a greater concern for its own well-being than for AMIC's financial risk.

49. An actual justiciable controversy exists between AMIC and MRAm involving AMIC's rights and MRAm's responsibilities under the relevant AMIC/MRAm policies.

50. For each of the claims below, litigation in Alabama was part of the dispute. Even in the Town of Woodland claim below, part of the dispute included AMIC seeking relief from Alabama courts.

51. The unreimbursed costs and legal fees were incurred by AMIC, an Alabama based entity.

52. Likewise, Alabama is the place where the AMIC decision makers decide to incur the costs and legal fees described below.

53. The AMIC demands to MRAm for full reimbursement of the below-described submitted claims all came from claims being managed in Alabama.

54. The lawyers and legal staff that generated the unreimbursed legal fees and costs described below are in Alabama.

55. MRAm directed its refusals to fully reimburse AMIC to AMIC employees that MRAm knew at the time of sending such denials were located in Alabama.

56. AMIC has satisfied all conditions precedent to suit.

8817001.2

## IV. CAUSES OF ACTION

COUNT ONE – BREACH OF CONTRACT (TOWN OF WOODLAND, AL)

57. AMIC adopts and alleges the allegations contained in paragraphs 1 through 56.

58. AMIC and Munich Re entered into an insurance treaty/policy as set forth above.

59. In 2009, the Town of Woodland, Alabama, ("Town") made a demand for a defense and coverage in connection with a Town Thanksgiving bus trip to Calloway Gardens. The bus was involved in an accident causing injury.

60. The case claiming injuries against the Town was initially filed in Alabama. Later the case was dismissed and re-filed in Georgia.

61. Ultimately, the Town had a $4,000,000 judgment against it for claims arising out of the bus accident.

62. The case was settled post-verdict for $2,000,000.

63. AMIC was able to bring in another insurer (NAMICO) to pay for a substantial portion of the eventual settlement of the case against the Town.

64. AMIC likewise paid a substantial amount that, in addition to the NAMICO supplied funds, satisfied the settlement amount.

65. MRAm reimbursed AMIC's portion of the settlement.

66. Under Article XII of the relevant treaty, Munich Re was subrogated to AMIC's rights against anyone who may be legally responsible in damages for said loss.

67. AMIC filed a legal action in Alabama to find NAMICO responsible for the entire settlement and thereby recover the MRAm-supplied portion of the settlement.

68. This legal action was unsuccessful, so AMIC was unable to recover that part of the settlement that AMIC paid and that MRAm paid to AMIC under an insurance demand.

69. AMIC timely sought reimbursement from MRAm of the costs associated with this effort against NAMICO.

8817001.2

70. On December 31, 2015, MRAm notified AMIC that it was not going to reimburse $385,546.03 in the costs of the litigation involving the Town and NAMICO.

71. Had AMIC been successful in its efforts to recover AMIC's portion of the settlement, AMIC would have been obligated to tender those recovered settlement funds to MRAm.

72. On information and belief, MRAm would have accepted that reimbursement as part of AMIC's subrogation obligation set forth above.

73. On information and belief, had AMIC been successful in recovering and returning to MRAm that portion of the Town of Woodland settlement, MRAm would have reimbursed or otherwise credited AMIC the costs of recovery of such funds.

74. MRAm breached the Treaty by not paying AMIC the final $385,546.03 due and owing to AMIC by MRAm.

75. AMIC was damaged by failing to receive $385,546.03 (plus pre-judgment interest) it was due from MRAm under the Treaty.

COUNT TWO – BREACH OF CONTRACT (SPANISH FORT, ALABAMA)

76. AMIC adopts and alleges the allegations contained in paragraphs 1 through 75.

77. AMIC and Munich Re entered into an insurance treaty/policy as set forth above.

78. In 2009, Spanish Fort, Alabama, was sued by land owners for water damage from a major and a minor rain event. Plaintiffs sought land remediation damages.

79. Spanish Fort made a demand on AMIC for a defense and indemnity.

80. The case was tried in Alabama and the plaintiffs received a substantial verdict.

81. AMIC incurred a total of $1,256.798 on this claim.

82. AMIC deducted one retention ($350,000) and submitted a claim to MRAm of $906,798.

83. On March 31, 2016, MRAm paid $544,395.12 and disallowed $362,402.88 on AMIC's claim.

84. MRAm claimed, among other things, that AMIC should have deducted two retentions of $350,000 each (for a total of $700,000) because there were rain events.

85. MRAm made this decision for doubling the retention based on the false and inaccurate assumption that damage occurred during the minor rain event.

86. AMIC asked MRAm to reconsider its decision but MRAm refused.

87. Such a denial by MRAm ignored the facts of the claim as well as the operation of Section I.1.b.(3) of the Spanish Fort/AMIC policy.

88. As a result of this breach of contract by MRAm, AMIC suffered damages in the amount of $362,402.88.

### COUNT THREE – BREACH OF CONTRACT (FAIRHOPE, ALABAMA)

89. AMIC adopts and alleges the allegations contained in paragraphs 1 through 88.

90. AMIC and Munich Re entered into an insurance treaty/policy as set forth above.

91. In 2006, the owners of the "Triangle" (an undeveloped property in Fairhope, AL) sought and were denied a zoning decision that would have allowed a Publix to be built on the Triangle.

92. In 2008, Fairhope, allegedly made zoning decisions that the owners of the Triangle claimed caused the Triangle to lose a substantial fair market value because the Fairhope 2008 zoning changed the traffic pattern.

93. In 2008 the Triangle owners sued Fairhope and the case initially went forward in federal court in the United States District Court for the Southern District of Alabama.

94. Fairhope demanded a defense and indemnity from AMIC.

95. The federal judge dismissed all claims except the state law claims associated with the 2008 zoning (traffic pattern) decision and remanded what was now a pure state law claim to state court about the 2008 zoning decision.

96. AMIC funded the litigation and settlement of the claim associated with the 2008 zoning decision.

97. AMIC incurred $917,672.64.

98. AMIC deducted its $350,000 retention and submitted to MRAm a $567,672.64 claim.

99. On May 2, 2018, MRAm announced that it was declining to pay the claim in full and stated it would only honor $217.672.64.

100. MRAm allegedly based its denial on its conclusion that AMIC should have applied two $350,000 retentions.

101. AMIC explained that the legal claims were related to the 2008 zoning decision and that two retentions were not appropriate.

102. MRAm refused to alter its denial.

103. The denial by MRAm ignored the facts of the claim.

104. MRAm breached the Treaty by not paying AMIC the final $350,000 due and owing to AMIC by MRAm.

105. AMIC was damaged by failing to receive $350,000 (plus pre-judgment interest) it was due from MRAm under the Treaty.

COUNT FOUR – BAD FAITH REFUSAL TO PAY (FAIRHOPE, ALABAMA)

106. AMIC adopts and alleges the allegations contained in paragraphs 1 through 105.

107. AMIC and MRAm had an insurance contract between them in the form of one of the Treaties referenced herein.

8817001.2

108. MRAm breached that contract by inappropriately applying two retentions instead of just one.

109. This decision was intentional by MRAm and was not changed by MRAm even after AMIC notified MRAm that it was wrong to apply two retentions.

110. MRAm's decision to deduct two retentions was not legitimate and wrongful.

111. MRAm was made fully aware of the wrongfulness of its decision but refused to revisit fully paying the claim.

112. MRAm's decision not to honor fully the Fairhope claim was in bad faith.

113. AMIC is entitled to an award of non-duplicative compensatory damages as well as exemplary damages based on the above-described actions of MRAm.

COUNT FIVE – BREACH OF CONTRACT (HANCEVILLE, ALABAMA, WATER WORKS BOARD ("HWWB"))

114. AMIC adopts and alleges the allegations contained in paragraphs 1 through 113.

115. AMIC and Munich Re entered into an insurance treaty/policy as set forth above.

116. Residents living on or around Mud Creek (near Hanceville, AL) sued the Hanceville Alabama Water Works Board ("HWWB") alleging its water treatment facility was insufficient to keep sewage from entering Mud Creek during a heavy rain storm.

117. Plaintiffs alleged that this insufficiency caused damage to their property.

118. The Complaint and the litigation centered on overflows that occurred in January 2008.

119. Inclusive of litigation and settlement, AMIC incurred on this loss $680,153.70.

120. AMIC deducted a single retention of $350,000 and submitted a claim to MRAm of $330,153.70.

121. MRAm paid zero.

122. MRAm's denial was announced to AMIC on October 8, 2018.

8817001.2

123. In the Treaty relevant to this claim, MRAm agreed to indemnify AMIC for "Ultimate Net Loss" as a result of losses occurring on or after May 1, 2006 under the Company's "Coverage Documents."

124. The trigger of coverage is a "loss" occurring under AMIC's Coverage Documents. means "the Company's liability to its insureds under the agreements between the Company and its insureds covering the classes of business indicated in paragraph A above and endorsements, riders, and other provisions . . . ."

125. The Treaty relevant to this claim obligates AMIC to investigate and defend any claim to which this insurance applies—e.g., the HWWB claim.

126. Likewise, the Treaty relevant to this claim gives Munich Re an opportunity to participate in the defense of any claim involving this insurance.

127. At the time of the actual litigation, that is, prior to settlement, MRAm made no effort to make suggestions as to the defense of the case.

128. Prior to the settlement of the case MRAm made no effort to assume control of the litigation.

129. MRAm denied the HWWB Claim because, according to MRAm, the claim spanned multiple years and therefore triggered multiple retentions.

130. AMIC explained to MRAm that all relevant events occurred in January 2008.

131. MRAm refused to change its position and paid nothing on this claim.

132. In denying this claim, MRAm ignored the facts.

133. MRAm breached the Treaty by not paying AMIC the final $330,153.70 due and owing to AMIC by MRAm.

134. AMIC was damaged by failing to receive $330,153.70 (plus pre-judgment interest) it was due from MRAm under the Treaty.

### COUNT SIX – BAD FAITH REFUSAL TO PAY (HANCEVILLE, ALABAMA, WATER WORKS BOARD ("HWWB"))

135.  AMIC adopts and alleges the allegations contained in paragraphs 1 through 134.

136.  AMIC and MRAm had an insurance contract between them in the form of one of the Treaties referenced herein.

137.  MRAm breached that contract by inappropriately applying two retentions instead of just one.

138.  This decision was intentional by MRAm and was not changed by MRAm even after AMIC notified MRAm that it was wrong to apply two retentions.

139.  MRAm's decision to deduct two retentions not based on the facts in the AMIC claim for insurance.

140.  MRAm was made fully aware of the wrongfulness of its decision but refused to revisit fully paying the claim.

141.  MRAm's decision not to honor fully the HWWB claim was in bad faith.

142.  AMIC is entitled to an award of non-duplicative compensatory damages as well as exemplary damages based on the above-described actions of MRAm.

### COUNT SEVEN – BREACH OF CONTRACT (CHILDERSBURG, ALABAMA)

143.  AMIC adopts and alleges the allegations contained in paragraphs 1 through 142.

144.  AMIC and Munich Re entered into an insurance treaty/policy as set forth above.

145.  AMIC insured, Childersburg, Alabama, was sued in connection with a private probation company known as Judicial Correction Services ("JCS").

146.  Initially, AMIC assigned the case to panel counsel.

147.  Panel counsel informed AMIC that the case involved a class action and that AMIC needed to engage the services of other counsel with greater background and experience in class action defense.

148. In accordance with that request, AMIC engaged the services of Balch & Bingham, LLP ("Balch") which assumed the role of lead counsel in the case.

149. MRAm asked what the Balch rate would be, AMIC responded that it speculated the rate would be a certain amount but it was clear this was just speculation and that rates were still being negotiated.

150. Around the same time as the Childersburg case, other cases were filed in Alabama and other states in the United States 11th Circuit Court of Appeals jurisdiction.

151. The amount of damages claimed by plaintiffs was over $100,000,000.

152. After extensive litigation, document production and processing challenges and planning, the Childersburg case resolved at the trial court level with a summary judgment for Childersburg.

153. These successful efforts included staying abreast of developments in other private probation cases and participating in 11th Circuit appeals as an *amici*.

154. The case against JCS continues.

155. AMIC sent to MRAm an initial claim and demand for reimbursement.

156. On November 12, 2018, MRAm responded that it would discount the claim by $449,042.

157. When challenged about this refusal to pay the entire claim, MRAm responded that it objected to Balch's rates, staffing of the case, and other issues.

158. Under the relevant Treaty, MRAm had a right to participate in the defense of the case as well as the right to access AMIC's records detailing the defense costs of the case. MRAm did not exercise these rights pre-AMIC demand.

159. Pre-demand, MRAm did not announce it reserved the right to reduce AMIC's claim because it disagreed with the rates AMIC approved for Balch.

160. AMIC asked MRAm to reconsider its decision and MRAm declined to do so.

161. MRAm's denial ignored the facts of the claim.

8817001.2

162. MRAm breached the Treaty by not paying AMIC the final $449,042 due and owing to AMIC by MRAm.

163. AMIC was damaged by failing to receive $449,042 (plus pre-judgment interest) it was due from MRAm under the Treaty.

### COUNT EIGHT – BAD FAITH REFUSAL TO PAY (CHILDERSBURG, ALABAMA)

164. AMIC adopts and alleges the allegations contained in paragraphs 1 through 163.

165. AMIC and MRAm had an insurance contract between them in the form of one of the Treaties referenced herein.

166. MRAm breached that contract by second guessing the rates and staffing of the litigation as well as the scope of the struggle in violation of its contractual obligations.

167. This decision was intentional by MRAm and was not changed by MRAm even after AMIC notified MRAm that it was wrong in its second guessing of rates, staffing and scope of the litigation.

168. MRAm's decision wrongfully denied AMIC its right to be reimbursed.

169. MRAm was made fully aware of the wrongfulness of its decision but refused to revisit fully paying the claim.

170. MRAm's decision to deny the Childersburg claim was not legitimate and wrongful.

171. MRAm's decision not to honor fully the Childersburg claim was in bad faith.

172. AMIC is entitled to an award of non-duplicative compensatory damages as well as exemplary damages based on the above-described actions of MRAm.

**WHEREFORE, PREMISES CONSIDERED**, AMIC demands judgment against the Defendant for compensatory and consequential damages in excess of the jurisdictional limitations of this Court, plus interests and costs.

8817001.2

Respectfully submitted this 1st day of May, 2020.

_____
John G. Smith, Attorney for Plaintiff

**OF COUNSEL**:

John G. Smith (ASB-8146-T68J)
Email: jgsmith@balch.com
Steven C. Corhern (ASB-3130-V84C)
Email: scorhern@balch.com
Aria B. Allan (ASB-2064-E10Q)
Email: aallan@balch.com
**BALCH & BINGHAM LLP**
Post Office Box 78 (36101)
105 Tallapoosa Street, Suite 200
Montgomery, AL 36104
Telephone:   (334) 834-6500
Facsimile:     (334) 269-3115

### JURY DEMAND

**AMIC DEMANDS A TRIAL BY STRUCK JURY ON ALL ISSUES TRIABLE THEREBY.**

**PLEASE SERVE DEFENDANT VIA CERTIFIED MAIL AS FOLLOWS:**

Munich Reinsurance America, Inc.
c/o Registered Agent, Solutions, Inc.
2094 Myrtlewood Drive
Montgomery, Alabama 36111

_____
OF COUNSEL

8817001.2