IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA MUNICIPAL INSURANCE CORPORATION, a non-profit corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:20cv300-MHT (WO) |
| MUNICH REINSURANCE AMERICA, INC., a foreign corporation, | ) ) ) ) | |
| Defendant. | ) | |

**OPINION ON AMIC'S SPANISH FORT CLAIM**

This litigation involves disputes between plaintiff Alabama Municipal Insurance Corporation (AMIC) and defendant Munich Reinsurance America, Inc. over assertions that each party failed to honor its obligations to the other under a series of reinsurance contracts, known as "treaties." Several of the disputes also involve competing interpretations of AMIC's underlying insurance contracts with its clients, which bind Munich under the terms of the reinsurance treaties. AMIC asserts five breach-of-contract claims

and seeks compensatory damages and pre-judgment interest as remedy. Munich denies it breached any treaties and asserts six counterclaims, requesting declaratory judgments from this court as remedy. Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity).

This lawsuit is now before the court on Munich's motion for summary judgment on one of AMIC's breach-of-contract claims: the claim arising out of AMIC's insurance policy with the town of Spanish Fort, Alabama. For the reasons below, summary judgment will be granted in favor of Munich and against AMIC on this claim.

## I. Legal Standard

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Background

### A. Overview of Parties and Treaty Structure

AMIC is a non-profit insurance company wholly owned by Alabama municipalities and regulated by the Alabama Department of Insurance.  It is chartered to insure Alabama's cities, towns, and subsidiary corporate entities, including bus services and police forces. Munich is a national provider of property and casualty reinsurance.

For at least ten years, between 2005 and 2015, AMIC and Munich entered into annual reinsurance agreements, formally known as "Casualty Excess of Loss Reinsurance Agreements," or treaties, wherein Munich took on a

portion of AMIC's risk in exchange for a portion of the premiums AMIC received from its insured clients. All of the underlying incidents at issue in this case occurred during that ten-year period.

This litigation began in May 2020, when AMIC accused Munich of five counts of breach of contract based on five insurance claims that AMIC submitted to Munich between 2015 and 2018, none of which Munich agreed to reimburse in full.[1] Munich denied that it breached any of its treaties with AMIC and filed six counterclaims, seeking declaratory relief regarding the interpretation of other treaties between Munich and AMIC and other contracts held by AMIC with its insured clients.

Munich filed a motion for summary judgment on all eleven claims and counterclaims. However, only one of

---

1. AMIC also asserted bad-faith refusal-to-pay claims against Munich, but those claims were dismissed earlier in this litigation. *See Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, 526 F. Supp. 3d 1133 (M.D. Ala., 2021) (Thompson, J.) (concluding that Alabama law does not extend the tort of bad faith to the reinsurance context).

AMIC's claims--as stated, the one arising out of its policy with Spanish Fort--is now before the court.

The factual allegations underlying the Spanish Fort claim, taken in the light most favorable to AMIC, are as follows. In March 2009, a major rain event resulted in the collapse of drainage systems, culverts, and catch basins in Spanish Fort, Alabama. This collapse led to a partial erosion of the bluffs upon which a subdivision was built. In response to the collapse and erosion, property owners filed two lawsuits against the town (the "Kessler lawsuit" and the "Amburgey lawsuit"), both alleging that the town's negligent maintenance of the drainage system had resulted in "the continuing erosion of the bluff and a de-stabilization of the bluff in its entirety." Munich Brief (Doc. 97) at 20.

At the time the lawsuits were filed, Spanish Fort held a commercial general liability policy with AMIC. AMIC and Munich do not dispute that the initial Kessler and Amburgey lawsuits against the town triggered AMIC's

obligations under the terms of 2009 policy.

In 2013, after several years of litigation, a jury awarded the homeowners in the Kessler lawsuit $ 1,335,800 against Spanish Fort, which was later remitted to $ 500,000 under a statutory tort cap. The trial court also ordered the town to repair the bluffs. Separately, the Amburgey lawsuit was settled in March 2014 for $ 75,000.

In April 2014, one month after the Amburgey lawsuit was settled, Spanish Fort experienced another major rain event, and the bluffs further eroded, leaving the homes of the Kessler plaintiffs in "imminent danger" of collapse. *See* AMIC Brief (Doc. 113) at 19.

AMIC argues that the 2009 erosion and the 2014 erosion have "only one cause"--the alleged negligent maintenance of the drainage system by Spanish Fort, which set this sequence of events into motion. AMIC Brief (Doc. 113) at 21. Munich disagrees, arguing that the 2009 erosion was the result of the 2009 rain event, and that the 2014 erosion was attributable to the 2014

6

rain event.

In the summer of 2014, the Kessler plaintiffs entered into a new round of mediation with Spanish Fort, arguing that the injunctive relief provided by the first lawsuit was not enough to provide a remedy for the new damage.  The parties reached a settlement, in which the homeowners agreed to release all claims surrounding the bluff, including future litigation.  In exchange, AMIC agreed to satisfy the original $ 500,000 judgment and pay an additional $ 350,000.  The town agreed to pay an additional $ 473,000 to resolve the injunction and take physical possession of the properties at issue.

AMIC combined its "Ultimate Net Loss" regarding all of these events and all related litigation into one claim, which it submitted to Munich under the 2009 reinsurance treaty, for the amount of $ 906,798.  This figure was calculated as follows:[2]

---

2. The court recognizes that there might be slight variations in the parties' precise breakdown of costs, based on the way claims are processed and costs

7

| Kessler lawsuit | $ 500,000 |
|---|---:|
| Amburgey settlement | 75,000 |
| 2014 new round of mediation | 350,000 |
| Other unspecified costs accrued during litigation | 331,798 |
| SUBTOTAL OF COSTS | $ 1,256,798 |
| Retention deduction | -350,000 |
| TOTAL REIMBURSEMENT | $ 906,798 |

In response to this bill, Munich agreed to pay $ 544,395.12, calculated as follows:

| Kessler lawsuit | $ 500,000 |
|---|---:|
| Amburgey settlement | 75,000 |
| Other unspecified costs accrued during litigation | 319,395.12 |
| SUBTOTAL OF COSTS | $ 894,395.12 |
| Retention deduction | -350,000 |
| TOTAL REIMBURSEMENT | $ 544,395.12 |

---

assigned.  However, the parties do not dispute the top-level sums the court identifies here.

Thus, Munich declined to pay $ 362,402.88 ($ 906,798 less $ 544,395.12) of the amount AMIC requested, arguing that these charges (which consisted of $ 350,000 for the 2014 cost mediation, etc.) arose from a series of events and litigation that could not be filed under the 2009 treaty.

Munich argued that the costs of the 2014 settlement negotiations between Spanish Fort and the property owners were the result of further erosion damage that did not occur until 2014, and, further, that these separate damages constituted a separate "occurrence," requiring an additional retention.  *See* Munich Brief (Doc. 97) at 85.  Munich agreed to pay the outstanding balance, less an obligatory $ 350,000 per-incident retention on AMIC's part, under the 2014 treaty.

### III. Analysis

As stated, Munich has moved for summary judgment against AMIC on the Spanish Fort claim.  The parties agree that this dispute is governed by Alabama law.

The court must now determine whether Munich has shown that it is entitled to judgment as a matter of law.

This court turns first to basic contract principles in order to determine whether a genuine issue of material fact remains to be decided. The inquiry begins by examining Munich's obligations to AMIC under the treaties held between the parties.

"Treaty reinsurance" is generally understood as a contract *to* reimburse: an agreement that a reinsurer will provide reimbursement on policies the insurer issues during a set period of time, even if the insurer has not yet written or issued those policies when the treaty is adopted. *See*, e.g., Graydon Staring et al., Law of Reinsurance § 2:4 (2022 ed.).

Alabama law is in line with these general principles and, under it, reinsurance treaties are a form of indemnity contracts to which general contract principles apply. *See Melco System v. Receivers of Trans-America Ins. Co.*, 105 So. 2d 43, 47 (Ala. 1958). In accordance with those principles, courts are

required to "enforce an unambiguous, lawful contract, as it is written." *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998). "When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state." *Id*. at 36.

This court, therefore, begins its analysis with the text of the 2009 treaty. Munich's obligations with AMIC under it were as follows:

> "The Reinsurer agrees to indemnify the Company, on an excess of loss basis, for Ultimate Net Loss paid by the Company as a result of losses occurring *under the Company's Coverage Documents* attaching during the term of this Agreement [] (emphasis added).
>
> "...The term 'Coverage Document' shall mean the Company's liability to its insureds under the agreements between the Company and its insureds []."[3]

Because Munich's obligations to AMIC were directly

---

3. Parties' Reinsurance Treaty for 2009 (Doc. 87-6) at 4; *see also, e.g.*, Parties' Reinsurance Treaties for 2012 (87-8) at 4 and 2014 (87-10) at 4 (using functionally identical language to describe the basic terms of the annual treaties).

11

tied to AMIC's obligations to its insured, the scope of the underlying insurance policy between AMIC and its insured is the question upon which this case ultimately turns.

With regard to regular insurance policies, Alabama law provides: "Any ambiguities in an insurance contract must be construed liberally in favor of the insured. A corollary to this rule is that exceptions to coverage must be interpreted as narrowly as possible in order to provide maximum coverage to the insured. However, courts are not at liberty to rewrite policies to provide coverage not intended by the parties. In the absence of statutory provisions to the contrary, insurance companies have the right to limit their liability and write policies with narrow coverage. If there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." *Johnson v. Allstate Ins. Co.*, 505 So. 2d 362, 365 (Ala.

12

1987) (internal citations removed).

The text of Spanish Fort's insurance policy reads in part as follows: "[AMIC] will pay those sums that the insured becomes legally obligated to pay as Damages because of Bodily Injury or Property Damage to which this insurance applies." Spanish Fort 2009 Policy (Doc. 89-11) at 3. The agreement then states that the insurance applies to property damage "only if ... the Bodily Injury or Property Damage occurs *during the policy period*." *Id*. (emphasis added).

The court finds that this language is not ambiguous as written: It caps AMIC's coverage obligations for the policy period to costs Spanish Fort was legally obligated to pay as a result of *property damage that actually occurred during that period*.

AMIC's arguments in opposition to summary judgment are not persuasive. First, it introduces a hypothetical to argue that there are at least some instances where the 2009 coverage policy *should* be read to extend to damage occurring after the termination of

13

the policy period, regardless of the policy's plain text. Specifically, it presents the court with an example in which a house fire begins before midnight on the last day of an insurance policy period. It argues that the insurance company would clearly be on the hook for all of the damage caused by that house fire, including the damage that took place after midnight, when the policy period was over. In support of this hypothetical, AMIC quotes the treatise American Jurisprudence, § 263: If a fire that begins during the policy period continues to burn, an insurer will be rendered "liable for the loss even though the property is not actually destroyed before such expiration." 43 Am. Jr. 2d Insurance § 263. However, and notably, the very next sentence of the treatise AMIC cites reads as follows: "The same rule [of extension] *does not apply*, however, where the property is merely imperiled at the time of the expiration of the policy by a fire in an adjoining building, although it eventually reaches and destroys the property." *Id*. (emphasis added). In other

14

words, even if the subdivision properties in Spanish Fort remained imperiled by the threat of continued erosion at the close of the 2009 coverage period, this is not enough to extend the coverage policy to property damage that did not actually manifest until five years later.

The house fire hypothetical is further inapposite given the basic facts of the case.  Unlike a house fire, which is a discrete event with a clear cause and effect, the gradual continuation of erosion over a period of five years, and any property damage resulting in separate lawsuits during that period, cannot rightfully override the plain text of an insurance document.

In line with this reasoning, the Alabama Supreme Court has consistently indicated that, where a policy explicitly restricts coverage to damage that occurs during the policy period (as is the case here), later damage is not covered.  In *American States Ins. Co. v. Martin,* 662 So. 2d 245, 250 (Ala. 1995), the court held

15

that the language of the "policies at issue in this case clearly provide that an injury, and not an occurrence that causes an injury, must fall within the policy period for it to be covered."  The court reached a similar conclusion in, for example, *State Farm Fire & Cas. Co. v. Gwin*, 658 So. 2d 426 (Ala. 1995), and *Liberty Mut. Ins. Co. v. Wheelwright Trucking Co. Inc.*, 851 So. 2d 466, 482 (Ala. 2002), in upholding the plain language reading of policies that explicitly limited coverage to damage and injury occurring during the coverage period.

This court is similarly unpersuaded by AMIC's second argument, which seems to turn on whether the disputed damages at issue ($ 350,000 for the 2014 cost of mediation, etc.) would or would not be covered by the 2014 policy AMIC had with Spanish Fort and, in turn, would or would not fall under the 2014 treaty between AMIC and Munich.  The argument is somewhat confusing, but seems to boil down to the contention that, because, in AMIC's view, the disputed damages are

16

not covered by the 2014 policy between AMIC and the town, the damages must be covered by the 2009 policy. The court sees no need to get into the reaches of the 2014 policy between AMIC and the town and the 2014 treaty between AMIC and Munich. The sole question, as posed earlier, is the extent of coverage of the 2009 policy between AMIC and the town. And the court holds that the unambiguous language of that policy does not cover the disputed damages. To be sure, AMIC may (or may not depending on the reach of the 2014 policy) have paid Spanish Fort more than it should have but this court can provide no relief to AMIC if it did.[4]

\*\*\*

Because there are other claims and counterclaims between the parties to be resolved, the court will not

---

4. In its brief and at oral argument, AMIC repeatedly referred to *Frankenmuth Mut. Ins. Co. v. Gates Builders, Inc.*, 2022 WL 1322261 at \*8 (S.D. Ala. May 3, 2022) (DuBose, J.). The court has read that decision and finds it somewhat hard to follow and confusing. To the extent it stands for legal principles contrary to those in this opinion, this court disagrees.

17

yet enter judgment with regard to AMIC's Spanish Fort claim. Instead, the court will meet with counsel for the parties to discuss what the next steps in this litigation should be.

DONE, this the 21st day of February, 2023.

                                          /s/ Myron H. Thompson
                                       **UNITED STATES DISTRICT JUDGE**