IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
ALABAMA MUNICIPAL          )
INSURANCE CORPORATION, a    )
non-profit corporation,     )
                            )
     Plaintiff,             )
                            )        CIVIL ACTION NO.
     v.                     )         2:20cv300-MHT
                            )            (WO)
MUNICH REINSURANCE          )
AMERICA, INC., a foreign    )
corporation,                )
                            )
     Defendant.             )
```

OPINION ON AMIC'S WOODLAND CLAIM

This litigation involves disputes between plaintiff

Alabama Municipal Insurance Corporation (AMIC) and

defendant Munich Reinsurance America, Inc. over

assertions that each party failed to honor its

obligations to the other under a series of reinsurance

contracts, known as "treaties." Several of the

disputes also involve competing interpretations of

AMIC's underlying insurance contracts with its clients,

which bind Munich under the terms of the reinsurance

treaties. AMIC asserts five breach-of-contract claims

and seeks compensatory damages and pre-judgment interest as remedy. Munich denies it breached any treaties and asserts six counterclaims, requesting declaratory judgments from this court as remedy.

Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity).

This lawsuit is now before the court on Munich's motion for summary judgment on one of AMIC's breach-of-contract claims: the Woodland claim, which arises out of AMIC's insurance policy with the town of Woodland, Alabama, as well as subsequent litigation between AMIC and Scottsdale Insurance Company. Oral argument was held on the motion as to this claim on August 28, 2023. For the reasons below, the court concludes that summary judgment should be granted in favor of Munich and against AMIC on the Woodland claim.

## I. Legal Standard

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or

defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  The court must view the admissible evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Background

### A. Overview of Parties and Treaty Structure

AMIC is a non-profit insurance company wholly owned by Alabama municipalities and regulated by the Alabama Department of Insurance.  It is chartered to insure

3

Alabama's cities, towns, and subsidiary corporate entities, including bus services and police forces. Munich is a national provider of property and casualty reinsurance based in Princeton, New Jersey.

For at least ten years, between May 1, 2005, and October 31, 2015, AMIC and Munich entered into annual reinsurance agreements, formally known as "Casualty Excess of Loss Reinsurance Agreements," or treaties, wherein Munich took on a portion of AMIC's risk in exchange for a portion of the premiums AMIC received from its insured clients.[1]  All of the underlying incidents at issue in this litigation occurred during that ten-year period.

In addition to plaintiff AMIC and defendant Munich,

---

1.   The parties do not dispute that Munich and AMIC were bound by reinsurance agreements during this approximately ten-year period, which is the time period relevant to this litigation.  Until September 2006, Munich was incorporated under a different name, American Re-Insurance Company, which is reflected in the text of the treaties but not otherwise germane to this dispute.  *See American Re to Become Munich Re America Starting in Sept.*, Ins. J. (Aug. 3, 2006), https://www.insurancejournal.com/news/national/2006/08/03/71076.htm.

the Woodland claim also involves a third insurance company: Scottsdale Insurance Company.[2]  At all times relevant to the Woodland claim, AMIC was under contract with Scottsdale for professional-liability insurance. In this context, the policy of professional-liability insurance primarily covered AMIC's risk of loss associated with its handling of claims on behalf of its insured.  Specifically, the policy covered losses resulting from claims alleging errors and omissions in AMIC's performance of its professional services.  *See Scottsdale Ins. Co. v. Alabama Mun. Ins. Corp.*, No. 2:11cv688-MEF, 2013 WL 5231928, at *2 (M.D. Ala. Sept. 16, 2013) (Fuller, J.), *aff'd*, 586 F. App'x 572 (11th

---

2. In their filings, the parties refer to Scottsdale Insurance Company as both "Scottsdale" and "NAMICO," which is short for the National Association of Mutual Insurance Companies.  At all times relevant to this case, the two companies operated in partnership. *See Scottsdale Ins. Co. v. Alabama Mun. Ins. Corp.*, 2013 WL 5231928, No. 2:11cv688-MEF, at *2 (M.D. Ala. Sept. 16, 2013) (Fuller, J.), *aff'd*, 586 F. App'x 572 (11th Cir. 2014).  For purposes of this litigation, "Scottsdale" and "NAMICO" can be used interchangeably.  For clarity, the court refers to the insurance carrier exclusively as "Scottsdale."

Cir. 2014).

Crucially, only AMIC and Scottsdale were parties to this professional-liability-insurance contract. Scottsdale did not have any contractual relationship with Munich.

The instant case, between AMIC and Munich, began in May 2020, when AMIC accused Munich of five counts of breach of contract based on five insurance claims that AMIC submitted to Munich between 2015 and 2018, none of which Munich agreed to reimburse in full.[3]  Munich denied that it breached any of its treaties with AMIC and filed six counterclaims, seeking declaratory relief regarding the interpretation of other treaties between Munich and AMIC and other contracts held by AMIC with its insured clients.

Munich filed a motion for summary judgment on all

---

3. AMIC also asserted bad-faith refusal-to-pay claims against Munich, but those claims were dismissed earlier in this litigation. *See Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, 526 F. Supp. 3d 1133 (M.D. Ala. 2021) (Thompson, J.) (concluding that Alabama law does not extend the tort of bad faith to the reinsurance context).

eleven claims and counterclaims.  The court has already issued rulings on two of those claims: AMIC's Spanish Fort claim, *Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, No. 2:20cv300-MHT, 2023 WL 2138904 (M.D. Ala. Feb. 21, 2023) (Thompson, J.) (hereinafter referred to as *Spanish Fort*); and AMIC's Hanceville claim*, Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, No. 2:20cv300-MHT, 2023 WL 3095558 (M. D. Ala. Apr. 26, 2023) (Thompson, J.) (hereinafter referred to as *Hanceville*).

As stated, only one of AMIC's claims is now before the court: the Woodland claim, which arises out of AMIC's insurance policy with the town of Woodland, Alabama, as well as subsequent litigation between AMIC and Scottsdale.

### B. Woodland Litigation

The factual allegations underlying the Woodland claim, taken in the light most favorable to AMIC, are as follows.

7

Between February 19, 2009, and February 19, 2010, AMIC provided the town of Woodland with a commercial automobile insurance policy. The limit of AMIC's liability to Woodland, as stated in the the terms of the policy, was $ 2 million per occurrence.

During this coverage period, on November 24, 2009, a Woodland employee drove a group of the town's citizens to visit Pine Mountain, Georgia. They traveled there and back in a town-owned vehicle. On the trip back, the driver, Billie Edmondson, missed a sharp turn in the road and crashed. Two passengers, Connie Meadows and Jeanette Holloway, sustained serious injuries as a result of the crash.[4]

After the crash, the two crash victims filed lawsuits against Woodland and Edmondson in a Georgia state court. AMIC, as the town's insurer, provided legal representation, and was joined by consent as an additional defendant. At trial, the crash victims

---

4. Holloway, who was rendered quadriplegic as a result of injuries she sustained, ultimately died, at

8

received jury awards of $ 340,000 (for Meadows) and $ 3,650,000 (for the Holloway estate).

A flurry of further litigation followed. AMIC, Edmondson, and Woodland appealed the Georgia court judgment, while simultaneously filing a new lawsuit in an Alabama state court. In both cases, AMIC argued that the victims' recoveries should have been capped at $ 100,000 each under an Alabama law limiting recovery of damages against governmental entities. The Georgia trial court disagreed, holding that the Alabama recovery cap did not apply. Instead, the court found that, under Georgia law, the recovery cap would be determined by the limits of Woodland's insurance policy with AMIC. As a result, the Georgia court set the cap at $ 2 million--the maximum coverage for which AMIC was liable as Woodland's insurer.

As AMIC was in the middle of appealing this decision and filing an additional lawsuit in an Alabama court, the crash victims filed garnishment actions and

_____

which point representatives of her estate took over her

probate-court claims, in order to attempt to secure their jury awards.

Ultimately, in January 2011, the crash victims filed a new lawsuit in a Georgia state court, this time suing AMIC directly on the grounds of negligent, wanton, and bad-faith failure to settle within policy limits. At this point, AMIC tendered defense of the lawsuit to its professional-liability-insurance carrier, Scottsdale.

### C. Scottsdale's Involvement

As explained above, Scottsdale's role in this case was to provide professional-liability insurance directly to AMIC. Scottsdale did not insure automobile losses or have any contractual relationship with the town of Woodland itself.

After AMIC was sued for failure to settle, Scottsdale took over AMIC's role in all underlying litigation, in addition to representing AMIC in its

---

role in all litigation.

defense against the failure-to-settle claims. Scottsdale agents assessed the factual record and reviewed all accumulated documentation, dating back to the beginning of the crash victims' lawsuit against Woodland. Ultimately, Scottsdale agents reached the position that the most cost-effective path forward would be for AMIC to settle with the crash victims for a total of $ 2 million.

AMIC and Scottsdale agreed to split the costs of the settlement as follows: First, AMIC would pay the initial $ 200,000, the amount that AMIC contended it rightfully owed to the crash victims under Alabama's tort liability cap. Second, AMIC and Scottsdale would evenly split the remaining $ 1,800,000 of the settlement.

Crucially, Scottsdale reserved the right to sue AMIC in a separate action in order to recover its portion of the payment ($ 900,000), based on the terms of the insurance policy that AMIC held with Scottsdale.

Eventually, the parties successfully settled all

claims by the crash victims. The crash victims received a total of $ 2 million, and all of their claims against Woodland, in its capacity as as AMIC's insured client, were resolved.

Roughly two weeks later, Scottsdale initiated a federal lawsuit against AMIC in Alabama, seeking a declaratory judgment that it was not obligated to pay its share of the settlement to AMIC. AMIC filed counterclaims for breach of contract and bad faith. Neither Woodland nor Munich was a party to this lawsuit.

The federal court ruled in favor of Scottsdale. *See Scottsdale Ins. Co. v. Alabama Mun. Ins. Corp.*, No. 2:11cv688-MEF, 2013 WL 5231928, at *2 (M.D. Ala. Sept. 16, 2013) (Fuller, J.). The court held that Scottsdale had no duty to pay the $ 900,000 portion of the settlement under the terms of its insurance agreement with AMIC and dismissed AMIC's counterclaims. The court also awarded Scottsdale its fees for pursuing the declaratory action: $ 188,909 in attorneys' fees,

12

$ 6,929.02 in costs, and $ 116,876.71 in interest on the judgment in its favor against AMIC.

AMIC appealed, and the Eleventh Circuit Court of Appeals affirmed in Scottsdale's favor. 586 F. App'x 572 (11th Cir. 2014). On remand, AMIC then paid an additional $ 45,997.60 to Scottsdale's attorneys, for fees and expenses associated with the appeal. AMIC also incurred $ 26,833.70 in pursing the litigation against Scottsdale.

The Scottsdale litigation cost AMIC $ 385,546.03. This figure was calculated as follows:

| Attorneys' fees | $ 188,909.00 |
|---|---|
| Costs | 6,929.02 |
| Interest | 116,876.71 |
| Fees on remand | 45,997.60 |
| AMIC's expenses | 26,833.70 |
| TOTAL COSTS | $ 385,546.03 |

### D. Munich Billing Dispute

In April 2015, after all of these lawsuits were finally resolved, AMIC sent a final notice of its Woodland motor-vehicle-accident claim to its reinsurance company: Munich. After deducting one $ 350,000 retention, AMIC requested reimbursement from Munich in the sum of $ 1,973,166.30 for its litigation as to Woodland. Munich agreed to pay this sum.

However, Munich declined to pay the $ 385,546.03 AMIC incurred in its litigation with Scottsdale, to which Woodland was not a party.

AMIC now brings this lawsuit, arguing that Munich has breached the terms of its reinsurance treaty by withholding $ 385,546.03 in fees that arose out of AMIC's lawsuit with Scottsdale.

As to the instant lawsuit, AMIC does not dispute that these fees are unrelated to the underlying Woodland litigation: AMIC explicitly notes in its briefing that this portion of the expenses "do not stem from payments made under the Woodland insurance

**14**

policy."     AMIC     Brief     Opposing     Summary     Judgment
(Doc. 113) at 108.

However, as in the Spanish Fort and Hanceville
claims that the court has already addressed, the
parties disagree about Munich's obligation to AMIC
under the terms of the applicable reinsurance treaty.


## III. Analysis

As stated, Munich has moved for summary judgment
against AMIC on the Woodland claim.  The parties agree
that this dispute is governed by Alabama law.  The
court must now determine whether Munich has shown that
it is entitled to judgment as a matter of law.

This court turns first to basic contract principles
in order to determine whether a genuine issue of
material fact remains to be decided.  The inquiry
begins by examining Munich's obligations to AMIC under
the treaties held between the parties, and determining
whether the terms of the treaties required that AMIC
attempt to recover $ 900,000 (plus fees) from its

15

professional liability insurer, Scottsdale.

AMIC argues that, in the context of the Woodland claim, the text of the relevant treaties created two obligations: (1) an obligation for AMIC to pursue recovery from Scottsdale and (2) an obligation for Munich to reimburse AMIC for costs associated with that pursuit.

Munich disagrees, arguing that a plain-text reading of the treaties will demonstrate that they do not create either of these obligations.

As explained in the *Spanish Fort* opinion, "'[t]reaty reinsurance' is generally understood as a contract *to* reimburse: an agreement that a reinsurer will provide reimbursement on policies the insurer issues during a set period of time, even if the insurer has not yet written or issued those policies when the treaty is adopted." *Spanish Fort*, No. 2:20cv300-MHT, 2023 WL 2138904, at *3; *see also* Graydon Staring et al., Law of Reinsurance § 2:4 (2022 ed.).

"Alabama law is in line with these general

principles, and, under it, reinsurance treaties are a form of indemnity contracts to which general contract principles apply. *See Melco System v. Receivers of Trans-America Ins. Co.*, 105 So. 2d 43, 47 (Ala. 1958). In accordance with those principles, courts are required to 'enforce an unambiguous, lawful contract, as it is written.' *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998). 'When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.' *Id.* at 36." *Spanish Fort*, No. 2:20cv300-MHT, 2023 WL 2138904, at *3.

However, as the *Hanceville* opinion observed, "'if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by the jury,' and summary judgment is not appropriate." *Hanceville*, No. 2:20cv300-MHT, 2023 WL 3095558, at *4 (quoting *McDonald v. U.S. Die Casting & Dev. Co.*, 585

17

So. 2d 853, 855 (Ala. 1991)).  This court, therefore,
begins its analysis with the text of the 2008 treaty
between AMIC and Munich.

Munich's general obligations with AMIC under the
treaty were as follows:

> "The Reinsurer agrees to indemnify the Company,
> on an excess of loss basis, for Ultimate Net
> Loss paid by the Company as a result of losses
> occurring *under the Company's Coverage
> Documents* attaching during the term of this
> Agreement ...
>
> "... The term 'Coverage Document' shall mean
> the Company's liability to its insureds under
> the agreements between the Company and its
> insureds []."

Parties' Reinsurance Treaty for 2008 (Doc. 87-6) at
4 (emphasis added).

The above treaty provision establishes that
Munich's obligations to AMIC were directly tied to
AMIC's obligations to its insured--in this case, the
town of Woodland.  *See Spanish Fort*, No. 2:20cv300-MHT,
2023 WL 2138904, at *3 (explaining that AMIC's dispute
with Munich over a similar treaty provision between the
two was directly tied to AMIC's obligations under its

insurance policy with the insured Spanish Fort).

In its filings, AMIC appears to readily concede that the costs for which it is seeking reimbursement from Munich are attributable to the legal battle between AMIC and Scottsdale, and did <u>not</u> arise directly from AMIC's insurance obligations to the town of Woodland. *See* AMIC Brief Opposing Summary Judgment (Doc. 113) at 108 ("[T]he Scottsdale payments do not stem from payments made under the Woodland insurance policy."). Munich is not generally liable for costs that AMIC decided to pay above and beyond its obligations to its insured clients (in this case, Woodland). *See Spanish Fort*, No. 2:20cv300-MHT, 2023 WL 2138904, at *4.

Because AMIC concedes that the fees associated with its litigation against Scottsdale "[did] not stem" from its underlying obligations to Woodland, it also conceded at oral argument that Munich is not obligated to reimburse AMIC for those fees under this provision of the treaty.

Instead, at oral argument, AMIC argued that it was
entitled to recover under another provision in the
treaty not at issue in the Spanish Fort and Hanceville
claims: the "Ultimate Net Loss" provision, which
accounts for the potential impact of any money that
AMIC might recover or salvage from a third-party
insurer, such as Scottsdale.  This provision of the
treaty reads as follows:

> "The term 'Ultimate Net Loss' shall mean the
> sum or sums paid by the Company for which it is
> liable, under Coverage Documents reinsured
> hereunder, including any Loss Adjustment
> Expenses and *Declaratory Judgment Expenses*.
> All sums hereunder shall be subject to proper
> deductions for all salvages, recoveries, and
> all other reinsurances or insurances that inure
> to the benefit of the Reinsurer under this
> Agreement, whether collectible or not.  The
> Reinsurer's liability hereunder *shall not
> increase* by reason of the inability of the
> Company to collect from any other reinsurer or
> insurer, for any reason, any amount that may be
> due from such reinsurer or insurer."

Parties' Reinsurance Treaty for 2008 (Doc. 87-6) at
17 (emphasis added).

A plain reading of the above provision simply
denotes that, if AMIC were to recover money from a

20

third-party insurer, Munich would be allowed to deduct a corresponding sum of money from its reimbursement to AMIC.   AMIC agrees with this reading in its brief, noting that "had AMIC been successful in the Scottsdale suit, AMIC would have been obligated to reimburse Munich Re the recovered settlement amount."   AMIC Supplemental Brief (Doc. 195) at 3.

However, AMIC goes further in its analysis of the "Ultimate Net Loss" provision above, arguing that its language also *obligated* AMIC to pursue any other reinsurances or insurances that might inure to Munich's benefit, and that this obligation, in turn, further *obligated* Munich to reimburse AMIC for this pursuit, win or lose.   *See id.* at 5.   The court disagrees. Nothing in the language of the above text establishes that AMIC is affirmatively obligated to seek recovery. Instead, a plain reading of the provision establishes only that, if and when AMIC should fail to recover money from a third-party insurer, Munich's liability, correspondingly, "shall not increase."   Parties'

Reinsurance Treaty for 2008 (Doc. 87-6) at 17.

Admittedly, the "Ultimate Net Loss" provision also includes this language: "The term 'Ultimate Net Loss' shall mean the sum or sums paid by the Company for which it is liable, under Coverage Documents reinsured hereunder, including any ... *Declaratory Judgment Expenses*." *Id.* The treaty's definition of "Declaratory Judgment Expenses" is as follows:

> "This Agreement shall protect the Company for Declaratory Judgment Expenses which are paid by the Company as otherwise provided under this Agreement.
>
> "... 'Declaratory Judgment Expenses as used in this Agreement shall mean *legal expenses* paid by the Company in the investigation, analysis, evaluation, resolution or litigation of *coverage issues between [AMIC] and its insured(s)*, under Coverage Documents reinsured hereunder, for a specific loss or losses tendered under such Coverage Documents[]."

*Id.* at 17-18 (emphasis added).

Munich interprets the above provisions to mean that it was responsible for costs involved in litigation between AMIC and its insured--here, Woodland. Because the additional litigation costs were accrued between

22

AMIC and Scottsdale, they do not constitute "legal expenses" for "coverage issues between [AMIC] and [Woodland]." The court agrees with this reading.

In general, AMIC repeatedly argues that, because AMIC would have been obligated to reimburse Munich for any amount of the Woodland settlement that it was able to recover from Scottsdale, Munich is correspondingly obligated to reimburse AMIC for the money it spent while attempting to secure such a recovery. But AMIC fails to identify any specific provision of the treaty creating an affirmative obligation for AMIC to pursue recoveries from third-party insurers in circumstances such as these. Similarly, AMIC does not identify any aspect of the treaty explicitly creating an obligation for Munich to pay for legal expenses arising between AMIC and Scottsdale. Those obligations simply aren't reflected in the text.

The fact that AMIC accrued legal costs as a result of its dispute with a third-party insurer, outside the express boundaries of its contract with Woodland and

23

its treaty with Munich, does not mean the court can attach a corresponding obligation to the treaty, which would effectively "mak[e] a new contract for the parties" in violation of long-standing contract law. *See Turner v. U.S. Fidelity and Guar. Co*, 440 So. 2d 1026, 1028 (Ala. 1983).  As explained in the *Spanish Fort* opinion, this court is not at liberty to rewrite policies--or treaties--in order to provide coverage not intended by the parties, in the absence of ambiguity or statutory provisions to the contrary.  *See Spanish Fort* opinio*n*, No. 2:20cv300-MHT, 2023 WL 2138904, at *4; *see also Pub. Risk Mgmt. of Fla. v. Munich Reinsurance Am., Inc.*, 38 F.4th 1298, 1301 (11th Cir. 2022) (emphasizing that courts should not infer provisions into a reinsurance agreement where "the agreement's plain and unambiguous language" do not provide any support for such an inference).

The 2008 treaty, as written, establishes that AMIC carries an affirmative burden to provide Munich with proof that any particular loss or loss-related expense

should be reimbursed. *See* Parties' Reinsurance Treaty for 2008 (Doc. 87-6) at 18. To meet that burden, AMIC must identify the provisions of the treaty that create financial obligations for Munich. In the briefs it has filed with this court, and the claims it submitted to Munich, AMIC has not met this requirement. None of the treaty provisions cited by AMIC establish any liability for Munich regarding the contested expenses of the instant claim.

The court is also cognizant of the broader context that both parties to the treaty were "sophisticated entities with bargaining power and access to legal counsel," each coming "to the table with a deep knowledge of insurance and an understanding of various contractual terms and conditions." *Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, 526 F. Supp. 3d 1133, 1138 (M.D. Ala 2021) (Thompson, J.). As this court explained in *Hanceville,* some insurers and reinsurers have responded to disputes over responsibility for settlements with insureds "by

incorporating loss-settlement clauses into their treaties, clearly describing the obligations of both the insurer and the reinsurer in the face of prospective or negotiated settlements." See *Hanceville*, No. 2:20cv300-MHT, 2023 WL 3095558, at *6 (citing *Fireman's Fund Ins. Co. v. OneBeacon Ins. Co.*, 49 F.4th 105, 112 (2d Cir. 2022) (describing "follow-the-settlements" clauses that include insurers' post-settlement allocation decisions); Staring, Law of Reinsurance § 18:3 (compiling a list of alternative clauses adopted in reinsurance treaties). The two sophisticated parties here, AMIC and Munich, could have done something similar, setting forth in their treaty that AMIC was *obligated* to pursue any other reinsurances or insurances that might inure to Munich's benefit, and that this obligation, in turn, further *obligated* Munich to reimburse AMIC for this pursuit, win or lose. But they did not include such a provision in their treaty.

Having submitted evidence sufficient to show that a

plain-text reading of the 2008 treaty between AMIC and
Munich is warranted, and further demonstrating that the
treaty does not establish either (1) that AMIC was
obligated to pursue recovery from Scottsdale or (2)
that Munich was obligated to cover costs incurred by
AMIC in that litigation, Munich has established that it
is entitled to judgment as a matter of law.
Accordingly, the motion for summary judgment on the
Woodland claim will be granted.

***

However, because there are other claims and
counterclaims between the parties to be resolved, the
court will not yet enter a summary-judgment order with
regard to AMIC's Woodland claim.  Instead, after the
other claims and counterclaims are resolved, the court
will meet with counsel for the parties to discuss what
the next steps should be on the Woodland claim.

DONE, this the 30th day of August, 2023.

                    /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE