IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

ALABAMA MUNICIPAL  )
INSURANCE CORPORATION, a )
non-profit corporation, )
          )
  Plaintiff,   )
          )  CIVIL ACTION NO.
  v.      )   2:20cv300-MHT
          )    (WO)
MUNICH REINSURANCE   )
AMERICA, INC., a foreign )
corporation,     )
          )
  Defendant.   )

### OPINION ON AMIC'S FAIRHOPE CLAIM

This litigation involves disputes between plaintiff Alabama Municipal Insurance Corporation (AMIC) and defendant Munich Reinsurance America, Inc. over assertions that each party failed to honor its obligations to the other under a series of reinsurance contracts, known as "treaties." Several of the disputes also involve competing interpretations of AMIC's underlying insurance contracts with its clients, which bind Munich under the terms of the reinsurance treaties. AMIC asserts five breach-of-contract claims and seeks

compensatory damages and pre-judgment interest as remedy. Munich denies it breached any treaties and asserts six counterclaims, requesting declaratory judgments from this court as remedy.

Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity).

This lawsuit is now before the court on Munich's motion for summary judgment on one of AMIC's breach-of-contract claims: the Fairhope claim, which arises out of AMIC's insurance policy with the city of Fairhope, Alabama. Oral argument was held on the motion as to this claim on May 20, 2024. For the reasons set forth below, the court concludes that summary judgment should be granted in favor of Munich and against AMIC on the Fairhope claim.

## I. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or

defense--on which summary judgment is sought.    The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).    A genuine dispute of material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).    The court must view the admissible evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.    *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

### A. Overview of Parties and Treaty Structure

AMIC is a non-profit insurance company wholly owned by Alabama municipalities and regulated by the Alabama Department of Insurance.    It is chartered to insure

3

Alabama's cities, towns, and subsidiary corporate entities, including bus services and police forces. Munich is a national provider of property and casualty reinsurance based in Princeton, New Jersey.

For at least ten years, between May 1, 2005, and October 31, 2015, AMIC and Munich entered into annual reinsurance agreements, formally known as "Casualty Excess of Loss Reinsurance Agreements," or treaties, wherein Munich took on a portion of AMIC's risk in exchange for a portion of the premiums AMIC received from its insured clients.[1]  All of the underlying incidents at issue in this litigation occurred during that ten-year period.

_____

1. The parties do not dispute that Munich and AMIC were bound by reinsurance agreements during this approximately ten-year period, which is the time period relevant to this litigation.  Until September 2006, Munich was incorporated under a different name, American Re-Insurance Company, which is reflected in the text of the treaties but not otherwise germane to this dispute.  *See American Re to Become Munich Re America Starting in Sept.*, Ins. J. (Aug. 3, 2006), https://www.insurancejournal.com/news/national/2006/08/03/71076.htm.

The instant case, between AMIC and Munich, began in May 2020, when AMIC accused Munich of five counts of breach of contract based on five insurance claims that AMIC submitted to Munich between 2015 and 2018, none of which Munich agreed to reimburse in full.[2]  Munich denied that it breached any of its treaties with AMIC and filed six counterclaims, seeking declaratory relief regarding the interpretation of other treaties between Munich and AMIC and other contracts held by AMIC with its insured clients.

Munich filed a motion for summary judgment on all eleven claims and counterclaims.  The court has already issued rulings on three of those claims:

(1) AMIC's Spanish Fort claim, *Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, No. 2:20cv300-MHT, 2023 WL 2138904 (M.D. Ala. Feb. 21,

---

2. AMIC also asserted bad-faith refusal-to-pay claims against Munich, but those claims were dismissed earlier in this litigation.  *See Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, 526 F. Supp. 3d 1133 (M.D. Ala. 2021) (Thompson, J.) (concluding that Alabama law does not extend the tort of bad faith to (continued...)

2023) (Thompson, J.) (hereinafter referred to as *Spanish Fort*);

(2) AMIC's Hanceville claim, *Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, 670 F. Supp. 3d 1327 (M.D. Ala. 2023) (Thompson, J.) (hereinafter referred to as *Hanceville*); and

(3) AMIC's Woodland claim, *Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, __ F. Supp. 3d __, __, No. 2:20cv300-MHT, 2023 WL 5608397 (M.D. Ala. Aug. 30, 2023) (Thompson, J.).

## B. Fairhope Litigation

The factual allegations underlying the Fairhope claim, taken in the light most favorable to AMIC, are as follows.

AMIC issued two public official liability policies to Fairhope: one that was in effect during 2006, and another that was in effect during 2008. The policies required AMIC to provide a defense to Fairhope in any

_____

the reinsurance context).

lawsuit seeking damages arising from its public officials' alleged wrongdoing. Besides their respective policy periods, the two policies were identical in all material respects.

Munich reinsured the polices under separate treaties, each of which obligated it to cover AMIC's ultimate net losses in excess of $ 350,000. In other words, both treaties stated that Munich's coverage kicked in only after AMIC took a $ 350,000 retention. Like the policies they reinsured, the treaties were materially identical.

In 2017, AMIC submitted a reinsurance claim to Munich for the legal expenses it incurred in providing a defense to Fairhope. The underlying litigation began in 2008, when four plaintiffs from the Dyas family sued Fairhope and its mayor for breaching a settlement agreement and impairing the market value of their property. The Dyases alleged that they settled an earlier lawsuit with Fairhope after the city promised to let them develop their property into a "neighborhood

village center[],” complete with retail outlets, commercial offices, residential units, and a grocery store. Dyases’ Compl. (Doc. 90-21) ¶ 11-13. According to the Dyases, the city represented that it would not approve the development of any new neighborhood village centers close enough to their property to foster competition.

As relevant here, the Dyases claimed that Fairhope breached the settlement agreement on two occasions. First, in 2006, Fairhope approved a zoning proposal to develop a nearby property into a competing neighborhood village center. Second, in 2008, Fairhope approved measures to alter the flow of traffic around the Dyases’ property, such as installing a traffic light and rerouting northbound traffic on a nearby street. The Dyases contended that these changes impaired the market value of their property.

AMIC helped fund Fairhope’s defense in the litigation with the Dyases. After all the claims were either dismissed or settled, AMIC billed Munich under

the treaty that reinsured the 2008 public official liability policy.  AMIC requested a sum that reflected the total costs it had expended on Fairhope's behalf, less one $ 350,000 retention.

Munich refused to reimburse AMIC for the full amount.  In Munich's view, AMIC had to take two $ 350,000 retentions because the events underlying the Dyases' suit occurred during different policy periods: the rezoning decision in 2006 triggered AMIC's 2006 public official liability policy, while the changes in traffic flow that Fairhope approved in 2008 triggered the 2008 policy.  Each policy was reinsured by a separate treaty, and each treaty required AMIC to take a $ 350,000 retention.  AMIC disagreed and subsequently asserted this breach-of-contract claim against Munich.

### III. ANALYSIS

As stated, Munich has moved for summary judgment against AMIC on the Fairhope claim.  The parties agree that this dispute is governed by Alabama law.  The

court must now determine whether Munich has shown that it is entitled to judgment as a matter of law.

The crux of the parties' dispute is whether the policies AMIC issued to Fairhope treat the 2006 rezoning decision and the 2008 alterations in traffic flow as a single course of allegedly wrongful conduct or two distinct acts. If Fairhope's alleged actions belong to the same course of conduct, AMIC could properly cede all of its losses to the 2008 policy. In that case, only one of the reinsurance treaties would have been triggered, and AMIC did not need to take more than one $ 350,000 retention. But if the Dyases alleged two distinct acts, both the 2006 and 2008 policies would have been triggered, along with the two treaties that reinsured them. Because the treaties each required AMIC to bear the first $ 350,000 of its losses, Munich's coverage would not have kicked in until AMIC took two retentions.

As explained in the *Spanish Fort* opinion, "'[t]reaty reinsurance' is generally understood as a

contract *to* reimburse: an agreement that a reinsurer will provide reimbursement on policies the insurer issues during a set period of time, even if the insurer has not yet written or issued those policies when the treaty is adopted." *Spanish Fort*, 2023 WL 2138904, at *3; *see also* Graydon Staring et al., Law of Reinsurance § 2:4 (2022 ed.).

"Alabama law is in line with these general principles and, under it, reinsurance treaties are a form of indemnity contracts to which general contract principles apply. *See Melco System v. Receivers of Trans-America Ins. Co.*, 105 So. 2d 43, 47 (Ala. 1958). In accordance with those principles, courts are required to 'enforce an unambiguous, lawful contract, as it is written.' *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So. 2d 33, 35 (Ala. 1998). 'When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.' *Id.* at 36." *Spanish*

*Fort*, 2023 WL 2138904, at *3.

However, as the *Hanceville* opinion observed, "'if the terms within the contract are ambiguous in any respect, the determination of the true meaning of the contract is a question of fact to be resolved by the jury,' and summary judgment is not appropriate." *Hanceville*, 670 F. Supp. 3d at 1331 (quoting *McDonald v. U.S. Die Casting & Dev. Co.*, 585 So. 2d 853, 855 (Ala. 1991)).

This court, therefore, begins its analysis with the text of the treaties between AMIC and Munich, which provided as follows:

> "The Reinsurer agrees to indemnify the Company, on an excess of loss basis, for Ultimate Net Loss as a result of losses ... under the Company's Coverage Documents ... .
>
> "The term 'Coverage Document' shall mean the Company's liability to its insureds under the agreements between the Company and its insureds ... ."

Parties' Reinsurance Treaty for 2007 (Doc. 87-5) at 4; *see also* Parties' Reinsurance Treaty for 2005 (Doc. 87-3) at 4 (including the same provisions but

using the term "members" instead of "insureds").

The above treaty provision establishes that Munich's obligations to AMIC were directly tied to AMIC's obligations to its insured--in this case, Fairhope. *See Spanish Fort*, 2023 WL 2138904, at *3 (explaining that AMIC's dispute with Munich over a similar treaty provision between the two was directly tied to AMIC's obligations under its insurance policy with the insured Spanish Fort).

The court turns to the text of Fairhope's insurance policies with AMIC in 2006 and 2008, which obligate AMIC to defend Fairhope in any suit for "Damages because of any Wrongful Act committed by the insured, or by any other person for whom the insured is legally responsible ... even if any of the allegations of the Suit are groundless, false or fraudulent." 2006 Policy (Doc. 90-18) at 63; 2008 Policy (Doc. 90-19) at 49. The policies define a wrongful act as follows:

> "Wrongful Act means any actual or alleged error [or] misstatement or act [or] omission or neglect or breach of duty ... by you in your official capacity ... . All Claims and Damages

> arising out of the same or substantially same or continuous or repeated Wrongful Acts will be considered as arising out of one Wrongful Act."

2006 Policy (Doc. 90-18) at 78; 2008 Policy (Doc. 90-19) at 64. At its core, the Fairhope claim is about whether the 2006 rezoning decision and 2008 alterations in traffic flow constitute "the same or substantially same or continuous or repeated Wrongful Acts" such that the polices treat them as one wrongful act. 2006 Policy (Doc. 90-18) at 78; 2008 Policy (Doc. 90-19) at 64.

AMIC argues that the Dyases' complaint alleged a single wrongful act: Fairhope's "policy, practice, or scheme of discriminating against the Dyases ... to prevent the development of their property." Br. in Opp. (Doc. 219) at 3. Munich responds on two fronts: first, that Fairhope's decisions in 2006 and 2008 cannot sensibly be treated as one wrongful act under the policies; and, second, that even if the Dyases alleged one wrongful act, the policies do not contemplate providing coverage for any part of a

wrongful act that occurs outside of the policy period. The court need not reach Munich's second argument because AMIC has not advanced a reasonable interpretation of the policies that would support collapsing the 2006 rezoning decision and 2008 alterations in traffic flow into one wrongful act.

AMIC's opposition to Munich's summary-judgment motion is premised almost entirely on a misreading of the policies' language. AMIC interprets the policies as collapsing wrongful acts whenever they are 'related.' "The definition of 'Wrongful Act,'" AMIC insists, "says that 'All Claims' and 'All Damages' arising from *related* Wrongful Acts are treated as arising from 'one Wrongful Act.'" Br. in Opp. (Doc. 219) at 14 (emphasis added); *see also id.* at 4 (interpreting the policies as merging "similar or *related* Wrongful Acts" into "a single Wrongful Act" (emphasis added)); *id.* at 19 ("[The policy] plainly states that 'All Claims and Damages' arising from *related* Wrongful Acts will be treated as one Wrongful

Act." (emphasis added)); *id.* at 15 (describing a policy that discussed "continuous, repeated or *interrelated* 'wrongful acts'" as using "nearly identical language" to the instant policies (quoting *In re Feature Realty Litig.*, 468 F. Supp. 2d 1287, 1301 (E.D. Wash. 2006) (McDonald, J.) (emphasis added)). AMIC emphasizes that the Dyases' complaint alleged that Fairhope's decisions in 2006 and 2008 were "interrelated." Br. in Opp. (Doc. 219) at 5; *see also id.* at 3 ("The Dyases alleged two interconnected discriminatory decisions by Fairhope."). During oral argument, AMIC reiterated its position that the court should deny Munich's summary-judgment motion if it determines that the 2006 and 2008 acts were related.

The word 'related' does not appear in the policies' definition of wrongful acts. Under that provision, only "the same or substantially same or continuous or repeated Wrongful Acts will be considered ... one Wrongful Act." 2006 Policy (Doc. 90-18) at 78; 2008 Policy (Doc. 90-19) at 64. The word 'related' appears

in a separate provision not mentioned by AMIC that
describes the combined policy limit:

> "[T]he Combined Policy Limit shown above is the
> most we will pay for the sum of all Damages
> arising out of an Occurrence, Wrongful Act, act
> or omission and any series of related
> Occurrences, Wrongful Acts, acts or omissions."

2006 Policy (Doc. 90-18) at 4; 2008 Policy (Doc. 90-19)
at 46.  This provision does not modify or supplant the
policies' definition of wrongful acts.  Therefore, AMIC
cannot defeat Munich's summary-judgment motion by
contending that Fairhope's 2006 and 2008 decisions were
somehow 'related' without also showing that they
involved the same, substantially the same, continuous,
or repeated wrongful acts.

AMIC protests that courts have consistently
interpreted policies with similar language as
collapsing any wrongful acts that are related.
However, AMIC identifies only two cases that, in its
view, dealt with roughly analogous insurance policies,
and the policies in both cases stated explicitly that
'related' or 'interrelated' wrongful acts constituted a

single wrongful act.  The first case centered on a policy that read: "All claims or suits for ultimate net loss arising out of the same wrongful act or series of continuous, repeated or *interrelated* wrongful acts will be construed as arising out of one wrongful act."  *In re Feature Realty Litig.*, 468 F. Supp. 2d 1287, 1301 (E.D. Wash. 2006) (McDonald, J.) (emphasis added) (internal quotation marks omitted).  The second case interpreted a policy with similar language: "All claims for damages based on or arising out of the same wrongful act or a series of *related* wrongful acts by one or more members shall be deemed one wrongful act." *See Pub. Risk Mgmt. of Fla. v. Munich Reinsurance Am., Inc.*, No. 8:18cv1449-T-35AEP, 2021 WL 2172741, at *3-4 (M.D. Fla. Jan. 21, 2021) (Porcelli, M.J.) (emphasis added) (capitalization altered), *report and recommendation adopted*, No. 8:18cv1449-MSS, 2021 WL 2172777 (M.D. Fla. Apr. 27, 2021).

The excerpts from each of the above-mentioned cases are standard related acts provisions, which "group[]

together otherwise distinct claims [that] have been deemed to be 'related' or 'interrelated.'" John Zulkey, *Related Acts Provisions: Patterns Amidst the Chaos*, 50 Val. U. L. Rev. 633, 633 (2016). The problem for AMIC is that "the defining feature of related acts provisions is that they always will contain either the word 'related' or 'interrelated,' and ... where the policy in dispute does not contain either term, then decisions on relatedness will be distinguishable (at best)." Zulkey, *supra*, at 636-37 (capitalization altered); *see also id.* at 637 ("[I]f the policy does not contain either the word 'related' or 'interrelated,' analysis as to whether the subject claims are related is likely to be irrelevant."). The policies discussed in the cases cited by AMIC treat 'related' or 'interrelated' wrongful acts as a single wrongful act. But, in the policies AMIC provided to Fairhope, the only mention of 'related' acts appears in the provision describing the limits of coverage; the definition of wrongful acts does not use the term

'related,' 'interrelated,' or any other word with a similar meaning.  The court is not at liberty to read language into the policies that AMIC, a "sophisticated entit[y] with bargaining power and access to legal counsel," chose not to include.  *Alabama Mun. Ins. Corp. v. Munich Reinsurance Am., Inc.*, 526 F. Supp. 3d 1133, 1138 (M.D. Ala 2021) (Thompson, J.).  The cases that AMIC cites are thus readily distinguishable because the policies at issue here require AMIC to show that Fairhope committed the same, substantially the same, continuous, or repeated wrongful acts in 2006 and 2008, not merely that those wrongful acts were related.[3]

---

3. During oral argument, AMIC claimed that adopting its reading of the policies would reduce coverage for Fairhope and "limit[] the potential exposure of AMIC and Munich Re," benefitting both parties before the court.  Rough Tr. at 17.  AMIC explained that the policies cap how much coverage they provide for each wrongful act.  The easier it is for AMIC to justify treating multiple wrongful acts as arising out of a single wrongful act, the quicker Fairhope will reach the limits of its coverage, and the less AMIC and Munich ultimately will have to pay.  However, the court is not at liberty to cherry-pick whichever interpretation of the policies would minimize the parties' financial responsibilities.

Even if the court could look past the differences in the policies' language, the two cases AMIC cites do not support its position that Fairhope's decisions in 2006 and 2008 were related. That is because, in the purportedly analogous cases, the underlying litigation alleged a litany of acts that caused the same, specific harm. In the first case, the plaintiffs in the underlying litigation alleged that a city government repeatedly encouraged and facilitated pedestrian access across their private beachfront property. *See Pub. Risk Mgmt.*, 2021 WL 2172741, at *19. The second case dealt with a suit over a city government's series of dilatory tactics to avoid approving a plat amendment for a planned unit development. *See Feature Realty*, 468 F. Supp. 2d at 1301. The acts in each of these cases were related precisely because they had the same immediate effect on the plaintiffs in the underlying litigation: foot traffic on private beachfront property and delaying a plat amendment's approval, respectively.

Here, the Dyases alleged that Fairhope's decisions

in 2006 and 2008 had the same downstream consequences: reducing the property's market value and interfering with the Dyases' development plans. But, unlike in the cases that AMIC invokes, the immediate effects of Fairhope's actions in 2006 and 2008 were profoundly different. The 2006 incident led to the approval of a nearby neighborhood village center, while the 2008 incident centered on changes in traffic patterns. Apples, meet oranges. Neither of the cases that AMIC cites supports its contention that Fairhope's decisions in 2006 and 2008 were related, much less that they involved the same, substantially the same, continuous, or repeated acts.

AMIC attempts to reconcile its position with the text of the policies by insisting that Fairhope had a common motive in 2006 and 2008: interfering with the Dyases' development plans. According to the Dyases' complaint, in both instances, Fairhope had the same "concerted scheme to discriminate against [them.]" Br. in Opp. (Doc. 219) at 17. AMIC argues that Fairhope's

decisions in 2006 and 2008 were borne out of the same, substantially the same, continuous, or repeated animus that Fairhope held against the Dyases.

AMIC's fixation on the alleged reasons for Fairhope's decisions is misguided for at least two reasons. First, the contention that Fairhope furthered the same scheme in 2006 and 2008 largely rehashes AMIC's argument that the two acts were related. But the plain text of the policies undermines AMIC's claim that mere relatedness suffices for the policies to treat two wrongful acts as a single wrongful act.

Second, the policies speak of similar wrongful *acts*, not acts with a similar wrongful *purpose*. By AMIC's logic, any two acts with a common objective would be sufficiently alike to constitute a single wrongful act. AMIC's position lacks any limiting principle and is at odds with the policies' requirement that only the same, substantially the same, continuous, or repeated wrongful acts may be treated as a single wrongful act. Two courses of conduct do not involve

the same, substantially the same, continuous, or repeated acts just because they have a similar goal. Going swimming and quitting smoking are in no sense the same, substantially the same, continuous, or repeated acts, even if the goal in doing both is to lower one's cholesterol; spending two days hitchhiking and taking a two-hour flight are not the same, substantially the same, continuous, or repeated acts either, even if the goal in doing both is to travel from Alabama to Washington, D.C.   The bare allegation of a shared objective does not transform otherwise disparate acts into the same, substantially the same, continuous, or repeated acts.   That is especially true here, where the 2006 rezoning decision and 2008 alterations in traffic flow were separated by two years.

This same reasoning forecloses another of AMIC's arguments: that Fairhope's decisions in 2006 and 2008 amount to a single wrongful act because they allegedly breached its settlement agreement with the Dyases.   The Dyases' allegations that Fairhope's decisions were

calculated to renege on the city's promises do not change the fact that rezoning a nearby property is fundamentally not the same act as redirecting traffic two years later.

AMIC offers one final argument that warrants discussion: that even if both policies were triggered, nothing in the reinsurance treaties expressly prohibited AMIC from allocating all of its losses to the 2008 policy. The Alabama Supreme Court rejected this view in *Liberty Mutual Insurance Co. v. Wheelwright Trucking Co.*, 851 So. 2d 466 (Ala. 2002), which held that each triggered policy's retention requirement must be enforced independently.[4] AMIC protests that this court dismissed *Wheelwright*'s

---

   **4.** *Wheelwright* interpreted an insurance policy with different language and involved the application of Georgia law. The Alabama Supreme Court's reasoning is nonetheless applicable here: Where multiple policies across different policy periods each include a retention provision, and more than one of those policies is triggered, "the intent of each policy" is to make the insured party "responsible for the [retention] during the coverage period of that policy." 851 So.2d at 479.

relevance to the instant litigation in *Hanceville*, but, in *Hanceville*, it was unclear which year's events were the basis of the plaintiffs' lawsuit in the underlying litigation. *See Hanceville*, 670 F. Supp. 3d at 1333-34. There is no comparable dispute here to preclude *Wheelwright*'s applicability. The parties agree that the Dyases sued over events in 2006 and 2008 and that AMIC funded Fairhope's defense against both sets of claims.[5] Under *Wheelright*, AMIC was subject to both reinsurance treaties' retention provisions.

In sum, no reasonable factfinder could conclude that the policies treat Fairhope's rezoning decision in 2006 and the changes it approved to the flow of traffic in 2008 as a single wrongful act. Because the Dyases' complaint centered on two distinct wrongful acts during

---

5. Although the court has resolved the summary-judgment motion by looking to the text of the policies, it bears mentioning that the claims related to the 2006 and 2008 events were disposed of differently in federal court. The claims that were remanded pertained mostly to the 2008 alterations in traffic flow, while the district court granted summary (continued...)

different policy periods, their lawsuit triggered the 2006 and 2008 policies that AMIC issued to Fairhope, as well as the treaties that reinsured them.   The two treaties independently required AMIC to bear the first $ 350,000 of its losses, which means that Munich correctly deducted two retentions from AMIC's total litigation expenses.   Summary judgment will therefore be granted to Munich on AMIC's Fairhope claim.

***

However, because there are other claims and counterclaims between the parties to be resolved, the court will not yet enter a summary-judgment order with regard to AMIC's Fairhope claim.   Instead, after the other claims and counterclaims are resolved, the court will meet with counsel for the parties to discuss what the next steps should be on the Fairhope claim.

DONE, this the 23rd day of May, 2024.

/s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**

---

judgment to Fairhope on almost all of the claims related to the 2006 rezoning decision.